**SBAITI & COMPANY PLLC**
Mazin A. Sbaiti, Esq.
California Bar No. 275089
2200 Ross Avenue
Suite 4900W
Dallas, Texas 75201
T: (214) 432-2899
F: (214) 853-4367
E: mas@sbaitilaw.com
*Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| **DR. LAURIE KLEIN,** **DR. CRAIG MAURER,** **DR. STEVE LIRINGIS AND LISA LIRINGIS,** **DR. TODD ANTOVICH** **AND CAROL ANTOVICH,** **DR. RANDY MANTZ AND CARLENE MANTZ,** **DR. PAMELA HART,** **DR. GREG MOLIS,** **DR. LES COHEN,** **DR. KEN CARLE,** **DR. SHANE STAKER AND KELLY STAKER,** **DR. KEITH ALEXANDER,** **BETSY STUMMER,** **DR. JOHN SUTO AND DR. BILLIE SUTO,** **DR. JEFFREY FAILING,** **DR. MICHAEL GAGNON,** **DR. CRAIG LADOW,** **MIMI H. DUONG,** **DR. CRAIG THORNALLY,** **DR. MARK de DUBOVAY AND BARBARA de DUBOVAY,** **DR. RONALD B. SANDERS,** **DR. PEGGY ANDERSON, AND** **DR. PAM WACHHOLZ AND BOB NESTE** | Civil Action No. 20-CV-03194-RS |
| *Plaintiffs,* | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| **vs.** | **DEMAND FOR JURY TRIAL** |
| **PARKER UNIVERSITY,** | |
| *Defendant.* | |

**FIRST AMENDED CLASS ACTION COMPLAINT**                                        **Page 1**

# I.

## __INTRODUCTION__

1.     Plaintiffs bring suit seeking damages arising out of the negligent, unfair, and unlawful conduct of Defendant Parker University. From 2012 through at least 2016, Parker University co-sponsored continuing-education seminars along with Steven L. Down. Parker entrusted Down—without supervision, monitoring, or diligence of any kind—to advertise and conduct the seminars and to use Parker's name and imprimatur.

2.     Foreseeably Down, whom the SEC had previously found guilty of orchestrating a Ponzi scheme (see https://www.sec.gov/litigation/admin/ia1715.txt), used the co-sponsored seminars to pitch securities to unsuspecting chiropractors, including Plaintiffs. The entity backing those securities—The Falls Event Centers—has since gone bankrupt as a result of what the bankruptcy trustee has called, predictably, a Ponzi scheme. The SEC charged Down with securities fraud for his seminar pitches  (see https://www.sec.gov/litigation/complaints/2018/comp24139.pdf).

3.     Plaintiffs and others similarly situated have lost millions as a result, while Parker University profited from the enterprise. That is wrong.

4.     Without Parker's participation and neglect, state-enacted safeguards would have prevented most if not all of Plaintiff's losses. Parker enabled Down to bypass those safeguards, dressing up his sales pitches with an air of legitimacy. It should have known better. And it bears responsibility for its actions.

Plaintiffs seek redress on behalf of themselves and others similarly situated.

**FIRST AMENDED CLASS ACTION COMPLAINT**                                    **Page 2**

## II.

## PARTIES

1.      Plaintiff Dr. Laurie Klein ("Klein") is a chiropractor who attended a continuing education course sponsored by Parker University in Monterey, California. She is a resident of Oakland, California.

2.      Plaintiff Dr. Craig Maurer ("Maurer") is a chiropractor who attended continuing education courses sponsored by Parker University in Sacramento, California and in Elk Grove, California. He is a resident of Napa, California.

3.      Plaintiff Dr. Steve Liringis ("Liringis") is a chiropractor who attended a continuing education course sponsored by Parker University in Charlotte, North Carolina. Plaintiff Lisa Liringis is his wife. They are residents of Greensboro, North Carolina.

4.      Plaintiff Dr. Todd Antovich ("Antovich") is a chiropractor who attended a continuing education course sponsored by Parker University in Elk Grove, California. Plaintiff Carol Antovich is his wife. They are residents of Wilton, California.

5.      Plaintiff Dr. Randy Mantz ("Mantz") is a chiropractor who attended a continuing education course sponsored by Parker University in Elk Grove, California. Plaintiff Carlene Mantz is his wife. They are residents of Reno, Nevada.

6.      Plaintiff Dr. Pamela Hart ("Hart") is a chiropractor who attended a continuing education course sponsored by Parker University in Denver, Colorado. She is a resident of Boulder, Colorado.

7.      Plaintiff Dr. Greg Molis ("Molis") is a chiropractor who attended a continuing education course sponsored by Parker University in Salt Lake City, Utah.  He is a resident of West Jordan, Utah.

**FIRST AMENDED CLASS ACTION COMPLAINT**                                        **Page 3**

8.     Plaintiff Dr. Les Cohen ("Cohen") is a chiropractor who attended continuing education courses sponsored by Parker University in Las Vegas, Nevada, El Segundo, California, and Costa Mesa, California. He is a resident of Victorville, California.

9.     Plaintiff Dr. Ken Carle ("Carle") is a chiropractor who attended a continuing education course sponsored by Parker University in Tampa, Florida. He is a resident of Sarasota, Florida.

10.     Plaintiff Dr. Shane Staker ("Staker") is a chiropractor who attended a continuing education course sponsored by Parker University in the Des Moines/Altuna area of Iowa. Plaintiff Kelly Staker is his wife. They are residents of West Branch, Iowa.

11.     Plaintiff Dr. Keith Alexander ("Alexander") is a chiropractor who attended a continuing education course sponsored by Parker University in Schaumburg, Illinois.  He is a resident of Pleasant Prairie, Wisconsin. Plaintiff Betsy Stummer is his significant other. She is a resident of Kenosha, Wisconsin.

12.     Plaintiff Dr. John Suto ("Suto") is a chiropractor who attended a continuing education course sponsored by Parker University in Portland, Oregon. Plaintiff Dr. Billie Suto is also a chiropractor and is his wife. They are residents of Enterprise, Oregon.

13.     Plaintiff Dr. Jeffrey Failing ("Failing") is a chiropractor who attended a continuing education course sponsored by Parker University in Las Vegas, Nevada He is a resident of Rochester, New York.

14.     Plaintiff Dr. Michael Gagnon ("Gagnon") is a chiropractor who attended a continuing education course sponsored by Parker University in Chicago, Illinois. He is a resident of Oak Forest, Illinois.

15.     Plaintiff Dr. Craig LaDow ("LaDow") is a chiropractor who attended a continuing education course sponsored by Parker University in San Mateo, California.  He is a resident of

**FIRST AMENDED CLASS ACTION COMPLAINT**                    **Page 4**

Concorde, California.  Plaintiff Mimi H. Duong ("Duong"), is Dr. LaDow's partner and a resident of Oakland, California.

16.     Plaintiff Dr. Craig Thornally ("Thornally") is a chiropractor who attended continuing education courses sponsored by Parker University in Centennial, Colorado. He is a resident of Colorado Springs, Colorado, Denver, Colorado and Littleton, Colorado.

17.     Plaintiff Dr. Mark de Dubovay ("de Dubovay") is a chiropractor who attended continuing education courses sponsored by Parker University in El Segundo, California. He is a resident of Huntington Beach, California.  Plaintiff Barbara de Dubovay is his wife and a resident of Huntington Beach, California.

18.     Plaintiff Dr. Ronald B. Sanders ("Sanders") is a chiropractor who attended continuing education courses sponsored by Parker University in Salt Lake City, Utah.  He is a resident of Castle Dale, Utah.

19.     Plaintiff Dr. Peggy Anderson ("Anderson" is a chiropractor who attended continuing education courses sponsored by Parker University in Colorado Springs, Colorado and Denver, Colorado.  She is a resident of Elk Grove, Colorado.

20.     Plaintiff Dr. Pam Wachholz ("Wachholz") is a chiropractor who attended continuing education courses sponsored by Parker University in Palm Springs, California.  She is a resident of Hemet, California.  Plaintiff Bob Neste ("Neste") is the husband of Dr. Wachholz and is a resident of Hemet, California.

21.     Defendant Parker University ("Parker") is a Texas non-profit corporation with its principal office in Dallas, Texas, and may be served through its registered agent, William E. Morgan, 2540 Walnut Hill Lane, Dallas, Texas 75229.

**FIRST AMENDED CLASS ACTION COMPLAINT**                                    **Page 5**

### III.

### <u>JURISDICTION AND VENUE</u>

22.     Pursuant to 28 U.S.C. § 1332(a), this Court has subject matter jurisdiction over this action because there is complete diversity of parties and the amount in controversy exclusive of interest and costs exceeds $75,000.

23.     This Court also has subject matter jurisdiction over the Complaint under 28 U.S.C. § 1332(d)(2) because at least one class member is diverse from at least one defendant and the total amount in controversy for the class exceeds $5,000,000.

24.     This Court has specific personal jurisdiction over Parker because this suit arises out of or relates to its contacts with California. This is so because Parker conducted, in this state, several of the continuing-education seminars that are the subject of this lawsuit, because it contracted with California residents in California for several of the transactions that are the subject of this lawsuit, and because it used the means and instrumentalities of interstate commerce and the mails in connection with those transactions, acts and courses of business alleged in this suit, several of which occurred in California.

Venue is proper under the federal venue statute, 28 U.S.C. § 1391 *et seq*., based upon the facts and circumstances alleged in this suit which show that a substantial number of the events from which the claims arise occurred in this jurisdiction and district.

### IV.

### <u>FACTUAL BACKGROUND</u>

**A.  The Co-Sponsored Seminars**

25.     From approximately 2012 through 2106, Parker sponsored continuing education seminars for chiropractors, featuring Down and companies that Down owned and controlled Free Continuing Education Association ("FCEA") and/or Financially Fit). Either Down, or one of these companies, was named as Parker's co-sponsor for the seminars. But in reality, Down controlled all aspects of the seminar except processing the applications for continuing-education credit with the various state chiropractic boards, which Parker handled.

**FIRST AMENDED CLASS ACTION COMPLAINT**                                                    **Page 6**

26.     Specifically, Parker's "Co-Sponsorship Agreement" gave Down responsibility for "registration, setting and collecting tuition and fees, advertising, marketing and promotions (which must have prior approval of Parker), payment of speaker(s) [sic] honorarium/expenses, selecting and paying the expenses for a classroom or other location, and paying any other incurred expenses." Attached as Exhibit A is a copy of the Co-Sponsorship Agreement between Parker and FCEA for a December 7-8, 2013 seminar in Charlotte, North Carolina.

27.     Thus, the co-sponsor relationship provided Down with the use of Parker's name and reputation. But Parker maintained control over Down and the seminar's content through the Co-Sponsorship Agreement that reserved for Parker the exclusive right to control the way its name and influence were used. "Co-sponsor shall provide the course and speaker information needed by Parker to complete the application for continuing education credit and to maintain its records. All advertising, marketing, public communications, and promotional materials must be approved by Parker and Co-sponsor must submit those materials to Parker in a timely manner."  In other words, Parker was responsible for vetting the content of its seminars and was the last line of defense to ensure its name and reputation were not being used to mislead unsuspecting seminar attendees.

28.     Parker's name and reputation, along with the promotional materials it authorized Down to utilize, attracted chiropractors to the seminars, caused them to choose these seminars instead of countless others that were available to them, and lent both the seminars and the university's co-sponsor—Down—an air of legitimacy and credibility when he solicited investments from them.

29.     During the seminars—and, really, as the motivating force for putting them on and paying for them in the first place—Down solicited attendees, such as Plaintiffs, to invest in The Falls Event Centers, Even Stevens, and other businesses he owned.

30.     Plaintiffs estimate that Parker and Down co-sponsored approximately 50 of these seminars.

31.     Down or his companies paid for all costs associated with the co-sponsored seminars, including Parker's charges for its role.

**FIRST AMENDED CLASS ACTION COMPLAINT**                                    **Page 7**

1    32.    Specifically, Parker was paid a "location fee" and received a multiple, often 150%,

2    of any costs it incurred.

3    33.    Seminar attendees, including Plaintiffs, each paid a $35 "processing fee", which

4    was passed through to Parker.   Parker "charged" this fee in exchange for processing the attendees

5    continuing state-required continuing education credits, ensuring that the seminar would be

6    accredited by the various state chiropractic boards, and providing the attendees their continuing

7    education credit vouchers.

8    34.    Parker's actual processing cost was *de minimus*, and the $35 charge was almost

9    entirely profit for the university.

10    35.    The Co-Sponsorship Agreement required Down to cover the cost of the seminar

11    speakers, which Parker knew from experience sponsoring other continuing education seminars

12    would cost thousands of dollars.  Parker likewise knew that Down was paying the advertising

13    costs, room costs, and other expenses of putting on the seminars. And it knew that, despite

14    incurring significant expense to put on the seminars, Down did not charge for attendance. In fact,

15    the name of the Steve Down company with whom Parker contracted to sponsor these seminars was

16    called "Free Continuing Education Association."   In other words, Parker knew Down was not

17    making a profit simply from chiropractors attending the seminars.

18    36.    Parker also knew that Down was soliciting money from attendees. And while it

19    apparently did not know what that solicitation was for (chiefly because it was not paying any

20    attention), it did know that Down was not selling the usual kinds of items marketed to chiropractors

21    at such events, such as equipment or tools used by chiropractors or wholesale items for resale in

22    their practices.

23    37.    At the time when Parker began its co-sponsor relationship with Down, Down had

24    already been prosecuted by the SEC (1) for selling "securities in the form of a pyramid marketing

25    plan," (2) for "fraudulently exaggerat[ing] earnings projections," and (3) for "fail[ing] to disclose

26    that Down had received virtually all the net profit of the company in the form of putative loan

27    repayments or other compensation." SEC News Digest, Issue 98-140 at 4 (July 22, 1998).

28

**FIRST AMENDED CLASS ACTION COMPLAINT**                                    **Page 8**

38.     But this did not deter Parker from enlisting Down as a co-sponsor of its continuing-education seminars because it apparently did not know or did not care. And it did not know because it had done nothing whatsoever to inquire into Down's background or his fitness for the role he was playing.

39.     Parker's careless failure to vet Down, while allowing him access to its name imbued Down's pitches with an air of legitimacy and lulled Plaintiffs into trusting Down due to his association with and sponsorship by the university. In other words, Parker University allied with Down, lending its name and reputation to the enterprise, as well as the platform it had created, the continuing-education seminars, causing the attendees to suspend the skepticism they might normally have had when shown an investment opportunity.

40.     Parker's careless failure to monitor Down and his marketing materials allowed Down to misleadingly advertise his role and participation in the seminar.  The ads – over which Parker had exclusive editorial control – often listed Down in the same sentence or line as the substantive chiropractic speakers or failed to distinguish his presentation from the ones that were part of the seminar. None of the ads expressly disclaimed that Down's presentation was not part of the seminar.  By combining and conflating his title, role, and presentation with the substantive portions, Parker allowed Down to mislead attendees into believing that he and his presentation had been vetted, approved, and endorsed by Parker.

41.     Parker turned a blind eye to Down's past securities fraud and his new get rich quick investment pitches and co-sponsored the seminars. Parker did this:

- by engaging in no review of the promotional material Down created for the seminars despite having the contractual right to do so;

- by conducting no diligence in investigating its new co-sponsor, Down, when a reasonable effort would have uncovered previous federal charges of securities fraud against him personally and a felony fraud conviction against the chief operating officer of The Falls Event Centers, the company Down was soliciting investments in; and

- by sending no university representative to monitor what happened at the seminars, heedless of the misuse of its platform.

**FIRST AMENDED CLASS ACTION COMPLAINT**                                    **Page 9**

42.     Down's pitches included all the trappings of classic securities fraud. Most notably, Down routinely described the event centers underlying the securities he pitched as very profitable when, instead, they were highly leveraged with high-interest debt and had consistently lost money, month after month.  This mirrors the SEC's allegations in their most recent action against Down, where the SEC alleged that Down kept two sets of books at The Falls Event Centers.

43.     Parker's Continuing Education Department, which housed the university's continuing-education platform, clothed Down with actual and/or apparent authority, authorizing and even contractually requiring him to promote the continuing-education seminars at which he delivered his predatory sales pitches to chiropractors. And even though actual chiropractic education did take place at the seminars, the legitimacy of that education only further bolstered the apparent credibility of Down's investment presentations, which he advertised as  something to help the "financial health" of attendees' practices.

44.     Unfortunately, Down did not help the financial health of Plaintiffs' practices. Instead, investments in Down's companies proved to be financially disastrous for the Plaintiffs. Parker, on the other hand, received substantial revenue from their attendance.

45.     Parker filed applications for approval of the continuing-education courses with state licensing boards. But it did not disclose Down's investment presentation or notify the boards that Down would be soliciting attendees, which is required in some states.

46.     For example, Parker submitted to the North Carolina State Board of Chiropractic Examiners an application for approval of the continuing-education seminar that Dr. Liringis attended. Parker did not provide that board with any information about Down's role or even any reference to his name. If they had made an appropriate disclosure, the board would not have approved the application because including Down's presentation violated North Carolina Statute 21 NCAC §10.027 – Continuing Education Seminars. Plaintiffs are informed and believe that the North Carolina State Board of Chiropractic Examiners sanctioned Parker for this violation.

**FIRST AMENDED CLASS ACTION COMPLAINT**                                    **Page 10**

47.     Parker's imprimatur carried significant weight with attendees, including Plaintiffs, and influenced how receptive the intended audience would be to the advertising, the presenters and the material presented.

48.     These circumstances—and the university's role in creating them—enabled Down to catch attendees such as Plaintiffs off guard. This is precisely the kind of behavior that state-licensing-board rules are designed to prevent. And it is inconsistent with generally accepted practices in the industry.

49.     In sum, FCEA, the business with whom Parker contracted to co-sponsor the seminars, made no profit from the seminars.  Parker knew that Down was soliciting investments at the seminars or, alternatively, knew Down was selling something and did not know the specifics because it did not ask and did not care.

50.     Significantly, personnel within Parker's Continuing Education Department recognized the risk and potential liability associated with the university's failure to monitor or control the seminars co-sponsored with Down, because they became aware of a lawsuit with facts similar to the Parker/Down relationship. The concerns about the risk of continuing a relationship with Down went unaddressed and the co-sponsor arrangement with Down continued for years, as the employee was instructed to ignore those concerns and just focus on generating income for Parker's Continuing Education Department.

51.     Even after Parker ignored the obvious question – why is Down paying for these presentations, what is he selling to our attendees, and how is he making money? – and even after its own employee expressed concern and notified them about a lawsuit arising from a similar co-sponsorship, Parker failed to send anyone to monitor Down or learn what he was doing, unsupervised, while trading on Parker's name.

52.     Parker should have known Down was the proverbial fox trying to enter the hen house before it opened the gate.  And it either did and did not care, or simply did not want to know of Down's predatory background and was happy to bury its head in the sand and profit from Down's efforts.

**FIRST AMENDED CLASS ACTION COMPLAINT**                              **Page 11**

**B.  The Falls Event Centers Scheme**

53.   Based in large part on Parker's relationship with, and endorsement of Down, many of the seminar attendees invested millions of dollars in The Falls Event Centers, Even Stevens, and other companies controlled by Down.

54.   Down's multi-touch sales pitch began at the co-sponsored seminars, typically during a catered lunch. Down would take the stage *in the classroom*, in front of the captive audience of chiropractors, and solicit them to invest in his companies.

55.   Down was often introduced by, and endorsed by, the chiropractic seminar speaker whose presentation Parker was certifying for continuing education credit.  Having Parker's speaker endorse Down's credibility and effectiveness further increased the attendees' trust in Down.

56.   Down would speak specifically about the companies' success and profitability, and he made specific promises to generate certain returns on the amounts invested.

57.   Down made false statements about his companies' profitability, the equity in and value of the land that supposedly secured the investments, and the rate of return that investors could expect to receive.

58.   Down's statements, supported by Parker's reputation, painted a rosy picture of a safe, solvent, investment vehicle in which chiropractors could place their retirement funds and savings. That picture could not be farther from the truth.

59.   It is clear Down never intended the companies to be profitable and never intended for them to produce the promised returns.

60.   To perpetuate his fraud, string along his current investors, and attract new ones, Down consistently represented (at every presentation) that The Falls Event Centers were very profitable when they were not. And he supported these lies with misleading financial documents. The company was never profitable according to generally accepted accounting practices ("GAAP"). And neither was it profitable using the non-GAAP accounting methods that Down had made up.

**FIRST AMENDED CLASS ACTION COMPLAINT**                              **Page 12**

61.     The Falls Event Centers nonetheless put out newsletters stating falsely in January and August of 2014 that "The Falls at St. George is now profitable and gaining momentum," and in October of 2015 that "[w]e currently have five event centers operating; each one operating profitably."

62.     Down likewise told investors at every presentation, including those attended by Plaintiffs, that the event centers were profitable.  And he buttressed these lies by providing them false financial information.

63.     In 2016, the CFO of The Falls Events Centers attended an investor presentation conducted by Down and afterwards told Down that he had to stop telling investors that the centers were making a profit because they were not. They never were.

64.     Down did not disclose to investors, including Plaintiffs, that the Falls Events Centers were not profitable according to GAAP, that they were using non-GAAP methods of determining profit and loss, that even utilizing the non-GAAP methods, they were not profitable, or that the executive team at the company had told him the events center model was unsustainable due to enormous debt. Instead, Down consistently and repeatedly told investors, including Plaintiffs, that the events centers were very profitable.

65.     Down represented falsely, in every presentation to investors, including to Plaintiffs, that many if not all of the event centers were profitable even before they opened due to advance bookings, that they continued to be profitable after opening, and that, after opening 12 centers, the company would be able to refinance on favorable terms.

66.     Down represented falsely, in every presentation to investors, including to Plaintiffs, that the Falls Events Centers would have 200 centers by 2022, that each center would earn gross revenue of $1 million per year, and that each center had expenses of approximately $650,000 per year.

67.     Down represented falsely, in every presentation to investors, including to Plaintiffs, that the 200 event centers would net $70 million per year, that they would achieve a price/earnings

**FIRST AMENDED CLASS ACTION COMPLAINT**                                    **Page 13**

ratio of 40,  causing them to be worth $2.8 billion by 2022, and that the company would go public or be bought out at that time.

68.     These representations were without basis, and were demonstrably false, when made. And they induced Plaintiffs not only to invest initially but also to reinvest interest and purported earnings and even to invest additional funds.

69.     Plaintiffs were invited to stockholder meetings and galas designed to fool them into believing that the companies in which they invested were financially solvent and prosperous. These events were also designed to prevent Plaintiffs from learning the truth, even in the exercise of significant diligence.

70.     Plaintiffs were shown false accounting figures and profitability information and other fraudulent statements that prevented them from learning, even in the exercise of significant diligence, that they had been deceived.

71.     On May 10, 2018, the United States Securities and Exchange Commission filed a Complaint against Down in Federal District Court in Utah (the "SEC Case") alleging the contours of his investment scheme. This is the first time the nature of the entire investment scheme was known or knowable.

72.     On May 11, 2018, the Court signed a Final Judgment against Down in the SEC Case ordering him to pay $150,000 in penalties under the Securities and Exchange Act.

73.     Importantly, even in the exercise of reasonable diligence, Plaintiffs were not likely to—and did not—run across this information immediately. And it took considerable time for the information to proliferate and reach the spheres of information to which they had access or could discover.

**C.  The Plaintiffs**

74.     Plaintiffs (or Plaintiffs' significant other, on whom Plaintiffs reasonably and foreseeably relied) were familiar with Parker and knew it to be a reputable, upstanding, trustworthy institution of chiropractic higher learning.

**FIRST AMENDED CLASS ACTION COMPLAINT**                                    **Page 14**

75.    Plaintiffs (or Plaintiffs' significant other, on whom Plaintiffs reasonably and foreseeably relied) relied on Parker to have vetted the seminars, the speakers, and the speakers' materials to be presented at the Parker-sponsored seminars.

76.    Plaintiffs (or Plaintiffs' significant other, on whom Plaintiffs reasonably and foreseeably relied) trusted that Parker performed due diligence on the instructors and presenters and that they were providing legitimate, trustworthy, and reliable information.

77.    Plaintiffs (or Plaintiffs' significant other, on whom Plaintiffs reasonably and foreseeably relied) believed Parker had vouched for Down's credibility by allowing him to advertise himself on equal ground with the instructors and to make presentations from the classroom stage during Parker-sponsored continuing education seminars.

78.    As Plaintiffs (or Plaintiffs' significant other, on whom Plaintiffs reasonably and foreseeably relied) listened to Down and his presentations, they suspended the skepticism they normally would have had when approached by a stranger pitching an investment opportunity because they relied on Parker's sponsorship of, and control over, the seminar.

79.    Plaintiffs (or Plaintiffs' significant other, on whom Plaintiffs reasonably and foreseeably relied) relied on the mistaken belief that information presented to them at a Parker-sponsored continuing education seminar would be truthful, accurate, reliable, and trustworthy.

80.    Plaintiffs (or Plaintiffs' significant other, on whom Plaintiffs reasonably and foreseeably relied) relied on Parker and based their decision to invest on the mistaken belief that Parker was vouching for the credibility of Down and the investment opportunities Parker allowed him to present at the Parker-sponsored continuing education seminars.

81.    While every investor knows that an investment has some risk and can lose money, the Plaintiffs did not know they were being defrauded and induced to invest in a scheme, based on lies, that was never intended to produce the promised returns.

82.    Plaintiff Dr. Klein received or viewed Parker's advertisement in 2012. She believes the advertisement specifically noted that Parker was sponsoring the seminar, and the speakers

included Down. Dr. Klein signed up for and attended the seminar held by Parker University in Monterrey, California, that same year. While at the first seminar, she heard Down advertise his business opportunity and tout attractive returns, and she invested approximately $50,000.00 soon thereafter. But for Parker's sponsorship, Dr. Klein would not have invested.

83.    Plaintiff Dr. Maurer first received or viewed Parker's advertisements in 2012. He believes the advertisements specifically noted that Parker was sponsoring the seminar, and the speakers included Down. Dr. Maurer signed up for and attended the seminars held by Parker University in Sacramento, California and in Elk Grove, California, on January 12 and 13 2013. While at the first seminar, he heard Down advertise his business opportunity and tout attractive returns, and he invested approximately $80,000.00 in The Falls Event Center soon thereafter. But for Parker's sponsorship, Dr. Maurer would not have invested.

84.    Plaintiff Dr. Liringis received or viewed Parker's advertisement in or about November 2013. He believes the advertisement specifically noted that Parker was sponsoring the seminar, and the speakers included Down. Dr. Liringis signed up for and attended the seminar held by Parker University in Charlotte, North Carolina on December 7-8, 2013. While at the seminar, Dr. Liringis heard Down advertise his business opportunity and tout attractive returns, and he invested $250,500.00 in The Falls Event Center soon thereafter and then invested approximately $200,000.00 in Even Stevens, and Financially Fit for $41,800.   Plaintiff Lisa Liringis is the wife of Dr. Liringis, and the funds used to invest were her community property, and she therefore owns part of the claim against Parker University.  But for Parker's sponsorship, Dr. and Mrs. Liringis would not have invested.

85.    Plaintiff Dr. Antovich received or viewed Parker's advertisement in or around 2015. He believes the advertisement specifically noted that Parker was sponsoring the seminar, and the speakers included Down. Dr. Antovich signed up for and attended the seminar held by

**FIRST AMENDED CLASS ACTION COMPLAINT**                                    **Page 16**

Parker University in at the Falls Event Center in Elk Grove, California  on March 21-22, 2015. While at the seminar, he heard Down advertise his business opportunity and tout attractive returns, and he invested $250,000.00 in The Falls Event Center soon thereafter.   He then invested $50,000.00 in Down Construction to build Falls Event Centers and then $300,000 in Even Stevens Sandwiches. Plaintiff Carol Antovich is the wife of Dr. Todd Antovich, and the funds used to invest were her community property, and she therefore owns part of the claim against Parker University. But for Parker's sponsorship, Dr. and Mrs. Antovich would not have invested.

86.     Plaintiff Dr. Mantz received or viewed Parker's advertisements in or around 2016. He believes the advertisements specifically noted that Parker was sponsoring the seminar, and the speakers included Down. Dr. Mantz signed up for and attended the seminars held by Parker University in Elk Grove, California, that year. While at the seminar, he heard Down advertise his business opportunity and tout attractive returns, and he invested $100,000.00 in The Falls Event Center soon thereafter and then invested $75,000.00 in Even Stevens, $50,000 in hotel construction, and $50,000.00 in Julia's Coffee Shop. Plaintiff Carlene Mantz is the wife of Dr. Mark de Dubovay, and the funds used to invest were her community property, and she therefore owns part of the claim against Parker University. But for Parker's sponsorship, Dr. and Mrs. Mantz would not have invested.

87.     Plaintiff Dr. Hart received or viewed Parker's advertisement in 2015 and 2016. The advertisement specifically noted that Parker was sponsoring the seminar, and the speakers included Down. Dr. Hart signed up for and attended the seminars held by Parker University in Denver, Colorado on February 7, 2015 and November 14, 2015. Dr. Hart also signed up for and attended the seminars held by Parker University in Denver, Colorado on February 20, 2016 and August 20, 2016.  While at the seminars, she heard Down advertise his business opportunity and tout attractive returns, and she invested $148,000.00 in The Falls Event Center soon thereafter and then

$100,000.00 in Even Stevens and another $100,000.00 in Financially Fit. But for Parker's sponsorship, Dr. Hart would not have invested.

88.     Plaintiff Dr. Molis received or viewed Parker's advertisement in or about September 2013. He believes the advertisement specifically noted that Parker was sponsoring the seminar, and the speakers included Down. Dr. Molis signed up for and attended the seminar held by Parker University in Salt Lake City, Utah on October 19, 2013. While at the seminar, he heard Down advertise his business opportunity and tout attractive returns, and he invested $50,000.00 in The Falls Event Center soon thereafter. But for Parker's sponsorship, Dr. Molis would not have invested.

89.     Plaintiff Dr. Cohen received or viewed Parkers' advertisements in 2013. He believes the advertisements specifically noted that Parker was sponsoring the seminar, and the speakers included Down. Dr. Cohen signed up for and attended the seminars held by Parker University in El Segundo, California on September 28-29, 2013.  While at the seminar, he heard Down advertise his business opportunity and tout attractive returns, and he invested approximately $25,000.00 in The Falls Event Center soon thereafter and then invested approximately $500,000.00 in Even Stevens and $75,000.00 in Financially Fit. But for Parker's sponsorship, Dr. Cohen would not have made these investments.

90.     Plaintiff Dr. Carle received or viewed Parkers' advertisement in or about December 2015. He believes the advertisement specifically noted that Parker was sponsoring the seminar, and the speakers included Down. Dr. Carle signed up for and attended the seminar held by Parker University in Orlando, Florida, on January 9, 2016. While at the seminar, he heard Down advertise his business opportunity and tout attractive returns, and he invested $250,002.00 in The Falls Event Center on March 30, 2016.  But for Parker's sponsorship, Dr. Carle would not have invested.

**FIRST AMENDED CLASS ACTION COMPLAINT**                                    **Page 18**

91.     Plaintiff Dr. Staker received or viewed Parkers' advertisements in Or around 2012. He believes the advertisements specifically noted that Parker was sponsoring the seminar, and the speakers included Down. Dr. Staker signed up for and attended the seminars held by Parker University in the Des Moines, Iowa area. While at the seminars, he heard Down advertise his business opportunity and tout attractive returns, and he invested $100,000.00 in The Falls Event Center soon thereafter. Plaintiff Kelly Staker is the wife of Dr. Mark de Dubovay, and the funds used to invest were her community property, and she therefore owns part of the claim against Parker University. But for Parker's sponsorship, Dr. and Mrs. Staker would not have invested.

92.     Plaintiff Dr. Alexander received or viewed Parkers' advertisements in 2015. He believes the advertisements specifically noted that Parker was sponsoring the seminar, and the speakers included Down. Dr. Alexander signed up for and attended the seminars held by Parker University in Chicago, Illinois, in June 2015. While at the seminars, he heard Down advertise his business opportunity and tout attractive returns, and he invested $300,000.00 in The Falls Event Center soon thereafter and also invested approximately $587,000.00 in Even Stevens. But for Parker's sponsorship, Dr. Alexander would not have invested.

93.     Plaintiff Betsy Stummer is the significant other of Dr. Keith Alexander.  As a result of Dr. Alexander meeting Mr. Down at a Parker seminar, Ms. Stummer was introduced to Mr. Down.  Dr. Alexander discussed with her Parker University's reputation, and based on its reputation, she invested approximately $180,000.00 of her own money with The Falls Event Center, Even Stevens, and Financially Fit. But for Parker's sponsorship of the seminar and reputation, Ms. Stummer would not have invested.

94.     Plaintiff Dr. John Suto received or viewed Parkers' advertisements in 2016.  He believes the advertisements specifically noted that Parker was sponsoring the seminar, and the speakers included Down. Dr. Suto signed up for and attended the seminar held by Parker

**FIRST AMENDED CLASS ACTION COMPLAINT**                                    **Page 19**

University in Portland, Oregon on May 21, 2016.  While at the seminar, he heard Down advertise his business opportunity and tout attractive returns, and he and his wife, Plaintiff Dr. Billie Suto invested $750,000.00 in The Falls Event Center on August 15, 2016. The funds used to invest were community property, and she therefore owns part of the claim against Parker University. Plaintiff Billie Suto is familiar with the Parker name, reputation, and integrity based on her experience as a chiropractor.  But for Parker's sponsorship, the Sutos would not have invested.

95.    Plaintiff Dr. Failing received or viewed Parkers' advertisements in 2012. He believes the advertisements specifically noted that Parker was sponsoring the seminar, and the speakers included Down. Dr. Failing signed up for and attended the seminars held by Parker University in Las Vegas, Nevada on January 10-12, 2013.  While at the seminars, he heard Down advertise his business opportunity and tout attractive returns, and he invested in The Falls Event Center soon thereafter. But for Parker's sponsorship, Dr. Failing would not have invested.

96.    Plaintiff Dr. Gagnon received or viewed Parkers' advertisements in 2016. He believes the advertisements specifically noted that Parker was sponsoring the seminar, and the speakers included Down. Dr. Gagnon signed up for and attended the seminars held by Parker University in Chicago, Illinois. While at the seminars, he heard Down advertise his business opportunity and tout attractive returns, and he invested approximately $200,000.00 in The Falls Event Center soon thereafter and approximately $200,000.00 in Even Stevens. But for Parker's sponsorship, Dr. Gagnon would not have invested.

97.    Plaintiff Dr. LaDow received or viewed Parkers' advertisements in or around 2011 or 2012. He believes the advertisements specifically noted that Parker was sponsoring the seminar, and the speakers included Down. Dr. LaDow signed up for and attended the seminars held by Parker University in or around Burlingame, California. . While at the seminars, he heard Down advertise his business opportunity and tout attractive returns, and he invested $800,000.00-

**FIRST AMENDED CLASS ACTION COMPLAINT**                                      **Page 20**

$1,000,000 in The Falls Event Center, Even Stevens, Financially Fit, Financially Fit Holding Co., and Julia's Coffee Shop soon thereafter. But for Parker's sponsorship, Dr. LaDow would not have invested.

98.     Plaintiff Mimi Huong is the significant other of Dr. Craig LaDow.  As a result of Dr. LaDow meeting Mr. Down at a Parker seminar, Ms. Huong was introduced to Mr. Down.  Dr. LaDow discussed with her Parker University's reputation, and based on its reputation, she invested approximately $1,000,000.00 of her own money with The Falls Event Center. But for Parker's sponsorship of the seminar and reputation, Ms. Huong would not have invested.

99.     Plaintiff Dr. Thornally received or viewed Parkers' advertisements in 2014, 2015 and 2016. He believes the advertisements specifically noted that Parker was sponsoring the seminar, and the speakers included Down. Dr. Thornally signed up for and attended the seminars held by Parker University in Denver, Colorado, on November 14, 2015, as well as seminars in Colorado Springs, Colorado on February 8-9, 2014 and in Littleton, Colorado on August 20, 2016. While at the seminars, he heard Down advertise his business opportunity and tout attractive returns, and he invested $250,000 in The Falls Event Center and $50,000.00 in Even Stevens soon thereafter. But for Parker's sponsorship, Dr. Thornally would not have invested.

100.    Plaintiff Dr. Mark de Dubovay first received or viewed Parker's advertisements in 2013. He believes the advertisements specifically noted that Parker was sponsoring the seminar, and the speakers included Down. Dr. de Dubovay signed up for and attended the seminars held by Parker University in Huntington Beach, California, on September 28 and 29, 2013. While at the seminar, he heard Down advertise his business opportunity and tout attractive returns, and he invested approximately $135,250.00 in The Falls Event Center and $100,00.00 in Even Stevens soon thereafter.  Plaintiff Barbara de Dubovay is the wife of Dr. Mark de Dubovay, and the funds used to invest were her community property, and she therefore owns part of the claim against

**FIRST AMENDED CLASS ACTION COMPLAINT**                                    **Page 21**

Parker University. But for Parker's sponsorship, Dr. de Dubovay and Mrs. De Dubovay would not have invested.

101.    Plaintiff Dr. Anderson received or viewed Parker's advertisement in or around 2015. She believes the advertisement specifically noted that Parker was sponsoring the seminar, and the speakers included Down. Dr. Anderson signed up for and attended the seminar held by Parker University in in or around Denver, CO in or around 2015. While at the seminar, Dr. Anderson heard Down advertise his business opportunity and tout attractive returns, and she invested $250,000.00 in The Falls Event Center on January 12, 2016 and $50,000.00 in Even Stevens. But for Parker's sponsorship, Dr. Anderson would not have invested.

102.    Plaintiff Dr. Sanders received or viewed Parker's advertisement in or around 2012. He believes the advertisement specifically noted that Parker was sponsoring the seminar, and the speakers included Down.  Dr. Sanders signed up for and attended seminars held by Parker University in Salt Lake City, Utah in or around September 2012.  While at the seminar, Dr. Sanders heard Down advertise his business opportunity and tout attractive returns and he invested $107,500 in The Falls Event Center soon thereafter.  But for Parker's sponsorship, Dr. Sanders would not have invested.

103.    Plaintiff Dr. Pam Wachholz first received or viewed Parker's advertisements in 2014. She believes the advertisements specifically noted that Parker was sponsoring the seminar, and the speakers included Down. Dr. Wachholz signed up for and attended the seminars held by Parker University in Palm Springs, California, on September 20, 2014. While at the seminar, she heard Down advertise his business opportunity and tout attractive returns, and she invested approximately $100,000.00 in The Falls Event Center and approximately $39,000.00 in Even Stevens soon thereafter.  Plaintiff Bob Neste is the husband of Dr. Pam Wachholz.  The funds used to invest were partially his and were all community property, and he therefore owns part of the claim against Parker University. But for Parker's sponsorship of the seminar and reputation, Dr. Wachholz and Mr. Neste would not have invested.

**FIRST AMENDED CLASS ACTION COMPLAINT**                              **Page 22**

## V.

## CLASS ALLEGATIONS

104.  Plaintiffs reallege and incorporate all prior paragraphs as if fully set forth herein.

105.  This action is brought on behalf of a class consisting of the following persons:

> All ascertainable persons in the United States who, between January 1, 2012 and July 11, 2018, attended a Parker seminar featuring Steve Down, and who invested in The Falls Event Centers within a period of three months thereafter. Excluded from the Class are Defendant, its corporate parent, subsidiaries and affiliates, officers and directors, any entity in which Defendant has a controlling interest, and their legal representatives, assigns of any such excluded persons or entities, and the attorneys for Plaintiff herein. Also excluded from the Class are any judges presiding over these proceedings and their immediate family members (the "Class").

106.  The Third Count, set forth below, is brought on behalf of a sub-class consisting of the following persons:

> All members of the Class who attended a Parker seminar featuring Steve Down in the State of California, and who invested in The Falls Event Centers within a period of three months thereafter (the "California Subclass").

107.  **Typicality**: Plaintiffs 'claims are typical of other Class members 'claims because Plaintiffs, like every other Class member, were exposed to virtually identical conduct and omissions by Parker.

108.  **Numerosity**: The members of the Class are so numerous that joinder of all members is impracticable. While the exact numbers of Class members are unknown to Plaintiffs at this time, Plaintiffs note that Parker sponsored approximately 50 seminars featuring Down, with several attendees at each.

109.  **Ascertainability**. The identities of individual Class members are readily ascertainable through appropriate discovery from records maintained by Defendant and its agents.

110.  **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable, the likelihood of individual Class members prosecuting separate claims is remote, and individual members do not have a significant interest in individually controlling the prosecution of separate

**FIRST AMENDED CLASS ACTION COMPLAINT**                    **Page 23**

actions. No difficulty will be encountered in this case's management to preclude maintenance as a class action.

111.   **Common Questions of Law and Fact Predominate**: The questions of law and fact common to the Class predominate over questions affecting only individuals. Among the questions of law and fact common to the Class are:

- Whether Parker had a duty to the Class to use reasonable care in exercising its right to control over the co-sponsored seminars.

- Whether Parker breached that duty.

- Whether Parker clothed Down with actual or apparent authority as a co-sponsor;

- Whether Parker and Down acted in concert as co-sponsors;

- Whether Parker is vicariously liable as co-sponsor for Down's acts and omissions;

- Whether Down and Parker failed to disclose material facts that they had a duty, as co-sponsors, to disclose to the Class;

- Whether Parker had a duty to class members to vet Down as a co-sponsor;

- Whether Parker had a duty to class members to vet promotional material that it authorized Down as co-sponsor to create and disseminate;

- Whether Parker had a duty to class members to monitor Down as a co-sponsor;

- Whether Parker had contractual duties to the Class;

- Whether Parker's inaction breached its contractual duties to class members;

- Whether Parker exercised reasonable care towards class members;

- Whether Parker has been unjustly enriched at the expense of class members;

- Whether Parker's revenues should be disgorged, and if so, the proper calculation of such revenues;

- Whether the Class is entitled to restitution and if so, the proper calculation of such restitution;

**FIRST AMENDED CLASS ACTION COMPLAINT**                                    **Page 24**

- Whether Parker violated state licensing laws or rules on continuing education;

- Whether such laws or rules create a standard of care owed to class members;

- Whether class members are entitled to relief;

- Whether class members are entitled to damages, and if so, the proper calculation of those damages.

112. **Manageability**: The Class litigation will be manageable because the causes of action brought on behalf of the Class are nearly identical, and individualized calculation of damages can be accomplished methodically by the use of data and information provided by Plaintiffs and by Defendant and its agents.

113. **Adequacy**: Plaintiffs can fairly and adequately represent the Class's interests; Plaintiffs have no conflicts of interest with other Class members and have retained counsel competent and experienced in class action and complex civil litigation.

## VI.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
#### NEGLIGENCE
**(BY ALL PLAINTIFFS ON BEHALF OF THEMSELVES AND THE CLASS)**

114. Plaintiffs reallege and incorporate all prior paragraphs as if fully set forth herein.

115. Parker breached its duty to act with reasonable care when co-sponsoring continuing-education seminars attended by Plaintiffs and the class.

116. Parker had a statutory duty to follow the relevant state chiropractic board rules when sponsoring continuing education seminars.

117. Parker breached these duties and was negligent as follows, without limitation, and as may be shown at trial:

   a. Sponsoring continuing education seminars with Down and his companies FCEA or Financially Fit, LLC;

   b. Failing to perform any or sufficient due diligence on Down and/or his companies prior to sponsoring his seminars across the country;

**FIRST AMENDED CLASS ACTION COMPLAINT**                                    **Page 25**

c. Allowing Down to give presentations in the classroom at continuing education seminars sponsored by Parker where he bilked attendees out of millions;

d. Sponsoring seminars with Down in which he solicited investments in presentations on the classroom stage in violation of state board chiropractic continuing education rules, and state administrative code and statutory provisions and norms, including, but not limited to:

    i.    California Code of Regulations 16 CCR §§ 362 & 363;

    ii.    Texas 22 TAC §§73.3 & 73.7;

    iii.    North Carolina Rule – 21 NCAC §10.0207 – Continuing Education Seminars;

    iv.    Nevada Administrative Code NAC 634.385; or

    v.    Florida Administrative Code § 64B2-13.004.

e. Submitting the applications for the continuing education courses without ensuring the appropriateness of the content of Down's presentations;

f. Failing to notify state boards that Down would be soliciting investments from attendees and/or making presentations inside the classroom;

g. Failing to ensure that—or even inquire whether—the seminar marketing materials complied with state chiropractic board rules and/or did not contain materially misleading content;

h. Failing to ensure—or even inquire whether—marketing materials did not contain impermissible and misleading representations about Down, his role at the seminars, and whether his presentation was part of the seminars;

i. Failing to supervise Down's presentations and/or to send representatives to the seminars to supervise and to ensure that—or at least monitor whether—Down did not violate state board rules or attempt to defraud attending chiropractors;

j. Unreasonably relying on Down to self-police his participation in the seminars—something that was contrary to his own financial interest;

k. Failing to require that Down provide his presentation slides or talking points to Parker so it could know what he was going to say to its continuing education attendees;

l. Failing to verify that—or even inquire whether—the information Down was providing to Parker's continuing education attendees was accurate or truthful;

**FIRST AMENDED CLASS ACTION COMPLAINT**            **Page 26**

m. Allowing Down to continually make false representations, including about the details of the investment opportunities he pitched, the financial stability and solvency of The Falls Event Centers, and the return that the investors could expect; and

n. Failing to audit the seminars after the fact.

118.   Parker breached its duty to exercise reasonable care in retaining, hiring, appointing, and/or authorizing Down to act as co-sponsor because neither Down individually nor the companies he controlled were fit to perform in such a role.

119.   Parker also breached its duty to exercise reasonably care in supervising Down's conduct, including the advertising materials, seminar materials, and seminar presentation he provided.

120.   Parker knew, and should have known, that hiring, appointing, and/or authorizing Down to act as co-sponsor, failing to supervise him, and allowing him to self-police the advertising for and conduct of the seminars would create a particular risk of harm to seminar attendees, including Plaintiffs and the Class.

121.   That risk materialized.

122.   Parker and Down, as co-sponsors, acted concertedly, authorized each other's acts and omissions, and clothed one another with actual and apparent authority.

123.   Parker and Down jointly participated in a concerted action which resulted in a common tort and accomplished their purpose.

124.   Plaintiffs were injured by Parker's acts and omissions.

125.   Each of these breaches, whether taken singularly or in combination, proximately and foreseeable caused Plaintiffs' injuries and damages.

## SECOND CAUSE OF ACTION
### DECEPTIVE TRADE PRACTICES
### STATUTORY VIOLATIONS
#### (BY ALL PLAINTIFFS ON BEHALF OF THEMSELVES AND THE CLASS)

126.   Plaintiffs reallege and incorporate all prior paragraphs as if fully set forth herein.

127.   Plaintiffs are individuals and are "consumers" under their respective State Deceptive Trade Practices laws.

**FIRST AMENDED CLASS ACTION COMPLAINT**                    **Page 27**

128.   Plaintiffs purchased goods or services from Parker University by paying $35 for Parker to process their continuing education vouchers with respective state chiropractic boards and by attending a seminar at which Parker was compensated for sponsoring the seminar and for each attendee.

129.   Parker's conduct constituted false, misleading, or deceptive acts or practices, including, but not limited to:

    a.   Causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

    b.   Causing confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another;

    c.   Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have, or that person has sponsorship, approval, status, affiliation, or connection that person does not have;

    d.   Falsely representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model;

    e.   Failing to disclose information concerning goods or services that was known at the time of the transaction if the failure to disclose was intended to induce the consumer into a transaction the consumer would not have entered into had the information been disclosed;

    f.   Promoting a pyramid promotional scheme; and

    g.   Allowing an investment scheme to masquerade as a series of continuing-education seminars.

130.   Each of the above is a violation of each Plaintiff's respective state consumer Deceptive Trade Practices law.

131.   Parker authorized and permitted Down to advertise the seminars either directly or through his companies, making Down its agents for purposes of the advertisements that went out.

132.   Plaintiffs were exposed to promotional materials.

133.   Each Plaintiff detrimentally relied on Parker's false, misleading, or deceptive acts, practices, or omissions.

**FIRST AMENDED CLASS ACTION COMPLAINT**                                        **Page 28**

134.     Parker's unfair and/or deceptive conduct was a producing and proximate cause of Plaintiffs' damages.

135.     Plaintiffs seek actual economic damages for the amounts they were induced into investing with Down and his companies.

136.     Parker's violations were committed "knowingly" as that term is defined in the respective consumer protection and deceptive trade practices statutes, and Plaintiffs therefore seek mental anguish damages as a result of losing their life savings and retirement savings.

137.     Parker's violations were committed "knowingly" as that term is defined in the respective consumer protection and deceptive trade practices statutes, and Plaintiffs therefore seek all available damages, including any allowable punitive damages and treble actual economic damages.

138.     Parker's violations were committed "intentionally" as that term is defined in the respective consumer protection and deceptive trade practices statutes, and Plaintiffs therefore seek all available damages, including any allowable punitive damages and treble mental anguish damages.

139.     Plaintiffs seek recovery of all costs and attorneys' fees awardable, pursuant to the respective consumer protection and deceptive trade practices statutes.

### THIRD CAUSE OF ACTION
#### CALIFORNIA UNFAIR COMPETITION LAW
#### CAL. BUS. & PROF. CODE § 17200
#### (BY ALL PLAINTIFFS ON BEHALF OF THEMSELVES AND THE CALIFORNIA SUBCLASS)

140.     Plaintiffs reallege and incorporate all prior paragraphs as if fully set forth herein.

141.     Parker engaged in unfair and unlawful business practices and in unfair, deceptive, and misleading advertising in connection with its sponsorship of continuing education seminars with Down.

142.     Parker's seminar attendees thought they were signing up for legitimate continuing education seminars, and while they did receive continuing education, the seminars were actually a pretext to solicit investments from them.

**FIRST AMENDED CLASS ACTION COMPLAINT**                                   **Page 29**

143.    Parker received significant monies and generated significant revenue for its "Continuing Education Department" by engaging in these unfair and unlawful business practices and by lending out its name and reputation to lure unsuspecting chiropractors to attend the seminars.

144.    Plaintiffs signed up to attend the continuing-education seminars co-sponsored by Parker in order to satisfy their annual state chiropractic board requirements.

145.    Advertisements for the seminars listed the chiropractic instructors and Down, without distinguishing between them or making it clear that Parker did not consider Down a Parker-endorsed presenter, which misled the attendees into believing that Down was an approved speaker, vetted and endorsed by Parker.

146.    Parker was responsible for ensuring that the seminar advertisements accurately conveyed who the seminar speakers were and for approving content they were providing.

147.    Parker negligently failed to ensure the advertisements accurately conveyed speaker and content information.

148.    Parker exacerbated the problems stemming from its endorsement of Down by allowing him to take the stage in the classroom at the co-sponsored seminars and, there, deliver his investment presentation from the same "classroom" stage used by the substantive chiropractic presenters.

149.    By advertising Down as an approved and endorsed speaker and allowing him to present from the classroom stage, Parker misrepresented its affiliation with Down and misrepresented to the attendees that it had vetted Down, approved his presentation, vouched for his credibility, and they provided him and his presentation the air of legitimacy he needed to lull the seminar attendees into letting down their guard and trusting him.

150.    Plaintiffs relied on Parker's misrepresentations, its apparent relationship with Down, its vouching for Down's credibility, status, legitimacy, and his involvement with Parker when deciding whether investing in The Falls Event Center and Down's other businesses was a sound financial decision and when deciding how much diligence was necessary.

**FIRST AMENDED CLASS ACTION COMPLAINT**                                    **Page 30**

151.   Plaintiffs relied on Parker's misrepresentations, its apparent relationship with Down, its vouching for Down's credibility, status, legitimacy, and its involvement with Parker when deciding whether Down and the investments he pitched were legitimate.

152.   Each of these misrepresentations was made with the intent that Plaintiffs would rely on it, the intent to induce doctors to attend the seminars, and the intent to increase the revenue Parker received as a result.

153.   Based on all of this, Plaintiffs decided to invest and suffered the damages they seek to recover in this lawsuit.

## VII.

## DISCOVERY RULE

154.   Plaintiffs reasonably monitored the performance of their investments and made reasonable inquiries upon learning of potential losses. They therefore exercised reasonable diligence in attempting to discover their causes of action.

155.   Even with the exercise of reasonable diligence, Plaintiffs were unable to discover and did not discover facts sufficient to identify their cause of action prior to May 10, 2018.

## VIII.

## JURY TRIAL REQUESTED

156.   Plaintiffs request trial by jury on all matters and issues triable to a jury under applicable law.

## IX.

## RELIEF REQUESTED

157.   Plaintiffs pray for their actual/compensatory damages and/or restitution in an amount to be proven at trial, including, but not limited to:

a.   An order certifying class action treatment;

b.   Actual economic damages;

c.   Mental anguish damages;

d.   Emotional distress damages;

**FIRST AMENDED CLASS ACTION COMPLAINT**                                    **Page 31**

e.   Punitive or treble damages;

f.   Recoverable and reasonable costs and attorneys' fees;

g.   Pre-judgment interest;

h.   Post-judgment interest; and

i.   Any and all other relief to which Plaintiffs may show themselves entitled.

Dated: September 17, 2020                    Respectfully submitted,

                                            **SBAITI & COMPANY PLLC**

                                            /s/ *Mazin A. Sbaiti*
                                            _____
                                            **Mazin A. Sbaiti**
                                            California Bar No. 275089
                                            mas@sabaitilaw.com
                                            JPMorgan Chase Tower
                                            2200 Ross Avenue – Suite 4900W
                                            Dallas, TX 75201
                                            T: (214) 432-2899
                                            F: (214) 853-4367

                                            **Counsel for Plaintiffs**

**FIRST AMENDED CLASS ACTION COMPLAINT**                    **Page 32**